**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 10-cv-00548-CMA-KLM

BOBBY ESPINOZA,

     Plaintiff,

v.

DEPARTMENT OF CORRECTIONS,

     Defendant.

───────────────────────────────────────────────────────────

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

───────────────────────────────────────────────────────────

This matter is before the Court on the Motion for Summary Judgment (Doc.
# 32), filed by Defendant Department of Corrections ("DOC").  Plaintiff Bobby Espinoza
alleges that DOC retaliated against him in violation of Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e-3, for asserting that he had been discriminated against
because of his race and national origin.  Jurisdiction is proper under 28 U.S.C. § 1331.
For the reasons discussed below, Defendant's motion is granted.

## I.  BACKGROUND

The following facts are undisputed unless otherwise noted.

Plaintiff is Hispanic and has worked for the DOC since 2004.  In a 2005
performance review, Plaintiff's then-supervisor, Shawna Troxel, who is Caucasian, rated
him as "Needs Improvement" in the area of "Accountability/Organizational
Commitment," explaining that Plaintiff had taken several sick days in conjunction with
his days off.  (Doc. # 32, Ex. A-2.)

In 2007, Warden James Abbott, who is African-American, promoted Plaintiff to a Correctional Officer II ("CO II") position at Colorado Territorial Correctional Facility ("CTCF").  Plaintiff was required to fulfill a six-month trial period, beginning April 1, 2007, before being certified as a CO II.  (Doc. # 32, Ex. A-3.)

On June 22, 2007, Plaintiff called in sick in conjunction with his day off.  His new supervisor, Captain Gary Moroney, who is Caucasian, drafted a Performance Documentation Form (the "Performance Documentation") that stated, in pertinent part:

> By calling off from your last scheduled 3rd Shift of Friday, 06-22-07, you effectively moved into your new Swing Shift days off, and had two days off instead of one.  As a Correctional Officer II, you should be setting positive accountability/organizational commitment examples.  Instead, your call off reflected a very bad example and sends a very negative message to supervisors and subordinates alike about your leadership skills.

(Doc. # 32, Ex. A-5.)  On June 27, 2007, Moroney met with Plaintiff about his use of sick leave.  The parties dispute the tenor of the meeting, but Plaintiff agrees that at some point he "expressed his belief that the [Performance Documentation] write-up was chicken shit."  (Doc. # 33, at 5, ¶ 9.)  Plaintiff did not sign the Performance Documentation.  (Doc. # 32, Ex. A-5.)  Based on his interaction with Plaintiff, Moroney filled out an Incident Report Form, which related Plaintiff's "chicken shit" comment and noted that he had refused to sign the Performance Documentation.  (Doc. # 32, Ex. A-7.)

On July 2, 2007, Plaintiff met with Moroney, Major Linda Maifeld, who is also Caucasian, and Associate Warden Michael Arellano, who is Hispanic.  (Doc. # 32, Ex. A-9.)  The parties dispute the tenor of this meeting, also.  However, Plaintiff's notes

of the meeting confirm Defendant's assertion that: when Moroney was explaining his previous interaction with Plaintiff, Plaintiff interrupted him; Maifeld asked Plaintiff not to interrupt Moroney, but Plainitff again interrupted him; and Plaintiff "pointed [his] finger at Moroney and told him he was lying through his teeth." (Doc. # 32, Ex. A-11, at 5, ¶ 1.)

The next day, July 3, 2007, Arellano met with Plaintiff and his union representative, Vincent Shaw, to discuss what had occurred during the June 27, 2007, and July 2, 2007, meetings. The parties again dispute what then transpired. In an affidavit, Plaintiff claimed he told Arellano that Moroney was discriminating against him because of his race. (Doc. # 33, Ex. 2, ¶ 19.) Shaw likewise asserted in an affidavit that Plaintiff raised the issue of racial discrimination at the meeting. (Doc. # 33, Ex. 8, ¶ 6.)[1] Defendant claims that Plaintiff did not assert racial discrimination (Doc. # 42, at 4, ¶ 19) and observes that neither Plaintiff's contemporaneous notes of the meeting (Doc. # 32, Ex. A-11, at 6, ¶ 2), nor a letter Shaw wrote summarizing the meeting (Doc. # 32, Ex. A-14), mentioned Plaintiff having done so. Arellano, in a later interview, denied that Plaintiff had alleged discrimination at the July 3, 2007, meeting. (Doc. # 32, Ex. A-10.) The parties also dispute Arellano's reaction to what Plaintiff told him. Plaintiff asserts that Arellano "acknowledged that cultural differences existed at CTCF." (Doc. # 33, at 11, ¶ 6.) Defendant contends that Arellano did not mention any such differences but, rather, "used the term 'Correctional Cultures' to describe how different facilities conduct business differently." (Doc. # 42, at 6, ¶ 6.) The parties agree that Arellano told Plaintiff

---

[1] These are the allegations of discrimination that Plaintiff claims he was retaliated against for having raised.

the Performance Documentation would not be put in his file (Doc. # 33, at 8, ¶ 20), but Plaintiff further asserts, and Defendant denies, that Arellano assured him "nothing would come of the prior interactions" involving Plaintiff at the June 27, 2007, and July 2, 2007, meetings (*id.*).

On July 10, 2007, Arellano sent a memo to Abbott, updating him on Plaintiff's actions.  (Doc. # 32, Ex. A-13.)

On July 16, 2007, Abbott issued Plaintiff a Corrective Action.  (Doc. # 32, Ex. A-15.)  The Corrective Action did not address the issue of Plaintiff having called in sick on June 22, 2007, but instead focused on the June 27, 2007, and July 2, 2007, meetings.  (*Id.*)  The Corrective Action cited Plaintiff's "chicken shit" comment to Moroney and stated that Plaintiff's actions during the July 2, 2007, meeting were "very unprofessional" and "extremely insubordinate."  (*Id.*)  The Corrective Action stated that Plaintiff was required to:

- read and write a report on the meaning and importance of the DOC Staff Code of Conduct;

- attend a professionalism and unlawful discrimination/sexual harassment class;

- watch, and report on, a program covering self discipline and emotional control; and

- submit a written apology to Moroney.

(*Id.*)  It noted that "[i]f this type of behavior happens again, there will be a Corrective or Disciplinary Action."[2]  (*Id.*)

On July 23, 2007, Plaintiff filed a grievance ("Step 1 Grievance") (Doc. # 32, Ex. A-16), alleging racial discrimination in the events leading up to, and including, Abbott issuing him the Corrective Action.[3]

Abbott reviewed the Step I Grievance.  (Doc. # 32, Ex. A-20.)  After meeting with Plaintiff and his representative, attorney Bill Finger, Abbott granted Plaintiff the following relief:

- removal of the Performance Documentation;

- modification of the Corrective Action to delete the requirement of reading and writing a report on the Staff Code of Conduct; and

- approval of Plaintiff's request to be transferred to another facility, pending completion of his trial period at CTCF and certification as a sergeant.

(*Id.*)  Abbott also agreed to "[a]n end to the abusive, retaliatory and hostile work environment if it occurred."  (*Id.*)  He left in place the Corrective Action, with the exception of the modification noted above, and denied Plaintiff's request for: payment of

---

[2]  Because the Corrective Action warns of a future Corrective Action for unmodified behavior, it is difficult precisely to discern its function.  However, as discussed below, because it was eventually removed from Plaintiff's file, without him having to fulfill its terms, the Court will characterize the Corrective Action as a "write-up."

[3]  Plaintiff also submitted an investigation request to the DOC's Office of the Inspector General ("OIG"), alleging discrimination and retaliation.  (Doc. # 32, Ex. A-17.)  The OIG's final report is included in the record.  (Doc. # 32, Ex. A-19.)  Plaintiff does not dispute Defendant's assertion that the report failed to substantiate Plaintiff's allegations.

attorney fees and costs in connection with the Corrective Action; payment of related medical expenses; and return of associated leave time Plaintiff had taken.  (*Id.*)

On August 14, 2007, Plaintiff filed a Step II Grievance with the Deputy Director of Prisons, Lou Archuleta.  (Doc. # 32, Ex. A-21.)  While the Step II Grievance was pending, Abbott certified plaintiff as a CO II (Doc. # 32, Ex. A-22), and Plaintiff was transferred to another facility (Doc. # 32, Ex. A-23).

On October 28, 2007, Plaintiff met with Archuleta, who granted him additional relief including, as pertinent here: removing the Corrective Action; acknowledging that Plaintiff's reassignment would be permanent; apologizing that the issue "rose to this level"; and reinstating 184 hours of Plaintiff's leave time.  (*Id.*)  However, Archuleta declined to: pay for any of Plaintiff's attorney fees or costs; reimburse Plaintiff for any medical expenses; or reinstate the rest of the leave time Plaintiff had taken during the grievance process.  (*Id.*)

Plaintiff filed a petition for a hearing with the Colorado State Personnel Board, seeking the relief Archuleta had not granted him.  (Doc. # 33, Ex. 12.)  The petition was denied.  (Doc. # 32, Ex. A-25, part 2, at 34.)

Plaintiff requested a right to sue letter, which he received on December 9, 2009. (Doc. # 1, at 2, ¶ 4.)  He filed his Complaint with this Court on March 9, 2010.  (Doc. # 1.)  Defendant filed its Answer on May 21, 2010 (Doc. # 8), and its Motion for Summary Judgment on March 31, 2011 (Doc. # 32).  Plaintiff filed his Response to the summary judgment motion on April 20, 2011 (Doc. # 33), and Defendant filed its Reply on May 4, 2011 (Doc. # 42).

## II.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See, e.g.*, *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir. 1991).  In applying this standard, the Court views the record, and draws all reasonable inferences therefrom, "in the light most favorable to the party opposing summary judgment."  *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1146  (10th Cir. 2007).

The movant bears the initial burden of showing an absence of any issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant need not negate the non-movant's claim but, rather, merely point to an absence of evidence supporting it.  *Id.* at 325.  If the movant meets its burden, the non-movant may not rest on its pleadings; instead, it must come forward with specific facts showing a genuine issue for trial as to each of its claims.  *Id.* at 325-26.

## III.  ANALYSIS

Defendant asserts, Plaintiff does not dispute, and the Court agrees that because Plaintiff has no direct evidence of having been retaliated against, his claim is subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).

## A.      BURDEN SHIFTING UNDER *MCDONNELL DOUGLAS*

Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of retaliation by Defendant.  *See id.*  If he does so, the burden shifts to Defendant to show "a legitimate non-discriminatory or non-retaliatory reason for the

adverse employment action."  *See id.*  And if Defendant meets this burden, the burden

shifts back to Plaintiff to show that Defendant's "proffered reason is pretext."  *See id.*

     1.    *Prima Facie* Case of Retaliation

To meet its initial burden of establishing a *prima facie* case of retaliation, Plaintiff

must show that: (1) he "engaged in protected opposition to discrimination"; (2) he

"suffered an adverse action that a reasonable employee would have found material";

and (3) "there is a causal nexus" between his opposition and Defendant's adverse

action.  *See id.*[4]

     a)    *Protected opposition to discrimination*

To show that he engaged in protected opposition to discrimination, Plaintiff must

be able to demonstrate that he had a good-faith belief that the opposed behavior was

discriminatory.  *See, e.g.*, *Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th

Cir. 1984).  Although this belief need not ultimately be correct, *see id.* ("opposition

activity is protected when it is based on a mistaken good faith belief that Title VII has

been violated"), it does have to be reasonable, *Hertz v. Luzenac America, Inc.*, 370 F.3d

1014, 1016 (10th Cir. 2004).  Thus, Plaintiff must do more than merely "conclusorily

incant" an allegation of discrimination.  *Maxey v. Restaurant Concepts II, LLC*, 654 F.

Supp. 2d 1284, 1296 (D. Colo. 2009).

---

[4] Regarding the "causal nexus" component of the *prima facie* framework, Defendant
states that "Plaintiff potentially meets the temporal proximity requirement to establish causation
if he is able to prove the first two elements of a *prima facie* case of retaliation."  (Doc. # 32, at
14.)  But based on the Court's analysis, below, of the first two components, it is unnecessary
to address Defendant's candid admission or to analyze the "causal nexus" component.

Here, according to Plaintiff, the protected opposition occurred during his July 2, 2007, meeting with Arellano and was in response to discrimination he had allegedly suffered, particularly during his June 27, 2007, interaction with Moroney, which had led to Moroney drafting the Performance Documentation.  Plaintiff asserts he had a good-faith belief that he was being discriminated against because: "he knew of other non-Hispanic employees that had called in to cancel their shift and not received a performance documentation"; he had "heard rumors about Hispanic employees being segregated into one cell house from non-Hispanic employees"; and he had "observed Mr. Moroney treating a non-Caucasian employee poorly, and this employee expressed his belief that the treatment was because of his race . . . ."  (Doc. # 33, at 15.)

Initially, the Court addresses Defendant's assertion that Plaintiff did not raise the issue of discrimination during the July 2, 2007, meeting.  Although Plaintiff's notes of the meeting conflict with his later affidavit, he did not compose the notes while under oath nor swear to their accuracy; accordingly, the affidavit is not necessarily "self-serving," as Defendant argues.  *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (discussing "sham fact issue[s]" created by a party submitting an affidavit that conflicts with prior sworn testimony).  Moreover, the Court is convinced that Shaw's affidavit significantly decreases the likelihood that Plaintiff's affidavit is only self-serving, because it corroborates Plaintiff's version of what occurred.  Thus, viewing the record in the light most favorable to Plaintiff, whether he raised the issue of discrimination at the July 2, 2007 meeting requires a credibility determination that cannot be made on summary judgment.  *See, e.g.*, *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is

9

axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

However, even assuming that Plaintiff raised the issue of discrimination at the meeting, the Court is convinced that he lacked a sufficiently reasonable good-faith belief that he had been discriminated against, as evidenced by his own deposition testimony. Regarding his assertion that non-Hispanic employees were allowed to cancel their shifts without receiving a performance documentation, Plaintiff averred that he was unsure of the race and national origin of such employees, although they "appeared to be white" from what he could recall, and said that he had no knowledge of their use of sick leave. (Doc. # 42, Ex. A-26.)  Additionally, the rumors Plaintiff had heard about employees being segregated by cell house were contrary to his own experience, which he said included being assigned to a cell house with both Hispanic and non-Hispanic employees.  (*Id.*)

The only potentially meritorious argument Plaintiff raises is that he allegedly had witnessed Moroney racially discriminate against a non-Caucasian employee. Defendant asserts that the Court should disregard this argument because Plaintiff "admits that the employee denied such treatment ever occurred."  (Doc. # 42, at 7.)  But Plaintiff averred that the employee had denied the abusive treatment when questioned by the OIG.  (Doc. # 42, Ex. A-26.)  Although not entirely clear, this statement makes it appear that the employee's denial occurred after the events giving rise to Plaintiff's allegations of discrimination.  Thus, the discriminatory treatment Plaintiff allegedly observed could have helped him to form a good-faith belief that he, too, had suffered

discrimination.  However, even if it occurred, this one isolated instance, in and of itself, is insufficient to establish that Plaintiff's belief was also *reasonable*.  *See, e.g.*, *Seybert v. Int'l Grp., Inc.*, No. 07-3333, 2009 WL 722291, at *21 (E.D. Pa. Mar. 17, 2009) (finding that "a reasonable person would not believe that . . . one instance" of allegedly discriminatory conduct would be sufficient for a Title VII retaliation claim) (unpublished).

Nor does Plaintiff's assertion–that Arellano "acknowledged . . . cultural differences existed at CTCF" (Doc. # 33, at 11, ¶ 6)–require a contrary conclusion.  Such commentary, even if it was made, is too speculative to support specific allegations of discrimination especially where, as here, those allegations are unsubstantiated and, in fact, in tension with Plaintiff's own deposition testimony.  *See, e.g.*, *Coleman v. Exxon Chemical Corp.*, 162 F. Supp. 2d 593, 623 (S.D. Tex. 2001) (where record disproved allegations of discrimination, court found that a "supervisor's philosophical generalizations about race relations [are] too speculative to serve as probative evidence of discrimination against a particular employee").

Rather, the reasons Plaintiff articulates for his belief that he had been discriminated against are more accurately reflected in his deposition testimony where, in response to a question about why he felt discrimination was the cause of the discipline he received, he answered, "I don't know.  I just felt that it was."  (Doc. # 42, Ex. A-26.)

Therefore, the Court finds that Plaintiff's allegations are too speculative to survive summary judgment.  *See, e.g.*, *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

Accordingly, Plaintiff has failed to do more than "conclusorily incant" an allegation of discrimination, and thus has not established the first component of the *prima facie* test.[5]

b)      *Adverse employment action*

Title VII protects an employee from retaliation that produces an injury or harm. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  To show injury or harm, Plaintiff must demonstrate that "a reasonable employee would have found the challenged action materially adverse."  *Id.*  The adverse action must "amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Meiners v. University of Kansas*, 359 F.3d 1222, 1230 (10th Cir. 2004) (internal quotation marks and citations omitted).

Here, Plaintiff alleges that the Corrective Action Abbott issued him was an adverse employment action and that it caused him to: fear that he would lose his job; pay the fees and costs of an attorney; incur medical expenses; and use several days of leave time.  The Court finds that these occurrences do not rise to the level of an adverse employment action under Title VII.

To begin with, the Corrective Action was removed from Plaintiff's file at Step II of the grievance process.  Thus, it could not have adversely effected Plaintiff's

---

[5]  Although the Court need not continue its analysis, *see, e.g.*, *Fernand v. Ampco System Parking*, No. 07-cv-01296, 2009 WL 903466, at *4 (D. Colo. April 1, 2009) (unpublished) (not addressing first two steps of the *prima facie* framework because plaintiff could not establish step three's causal nexus), out of an abundance of caution it will address the second component–adverse employment action–as a retaliation case can be dismissed for failure to satisfy any of the three components.

employment with DOC from that point forward, nor did it hinder his advancement until that point, as evidenced by his certification to CO II and transfer to a new facility while the grievance process was pending.  *See Wheeler v. BNSF Ry. Co.*, 418 Fed. Appx. 738, 748-49 (10th Cir. 2011) (unpublished) (noting that actions remedied by employer could not be considered adverse employment actions); *Deflon v. Danka Corp. Inc.*, 1 Fed. Appx. 807, 819 (10th Cir. 2001) (unpublished) (same); *Green v. Clovis Mun.Schs.*, No. 99-2115, 2000 WL 177414, at *2 (10th Cir. Feb. 16, 2000) (unpublished) (same).

Further, the Court is persuaded neither by Plaintiff's argument that "an unrealized threat of termination" constitutes an adverse employment action nor by his attempt to portray what happened to him as such a threat.  First, Plaintiff's reliance on *Jeffries v. State of Kansas*, 147 F.3d 1220 (10th Cir. 1998), is unavailing.  The *Jeffries* court specifically determined "not [to] decide whether threats can constitute 'adverse employment action' in and of themselves . . . ."  147 F.3d at 1232.  In addition, to the extent *Jeffries* has been cited for the proposition that an adverse employment action need not be material under Title VII, it is in conflict with the plain language of *Burlington Northern*, 548 U.S. at 68, as well as "more contemporary Tenth Circuit caselaw that . . . suggests a materiality requirement is part of the definition of an adverse employment action."  *Mirzai v. State of New Mexico General Servs. Dept.*, 506 F. Supp. 2d 767, 784 (D.N.M. 2007) (collecting Tenth Circuit cases).  Additionally, Plaintiff's citation to *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1270 (10th Cir. 2005), for the proposition that a "write-up . . . constitutes an adverse employment action" is also inapposite

because the court in that case held that the plaintiff's "single write-up [was] **not** an

adverse employment action."  (Emphasis added.)

In any event, Plaintiff fails to indicate how, other than by stating his subjective

belief that he was in danger of losing his job, the Corrective Action was "an unrealized

threat of termination."  The Court is not persuaded by Plaintiff's citation to *Roberts*

*v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998), in which the court

discerned an adverse employment action where "the record indicate[d] that the more

warnings [the] employee received, the more likely he or she was to be terminated for

a further infraction."[6]  In the instant case, Plaintiff received just one write-up, the

Corrective Action.  The Court has reviewed the document, and it contains no threat

of termination but rather, as previously mentioned, warns only of the potential for

"a Corrective or Disciplinary Action" if Plaintiff were not to modify his behavior.

Finally, Plaintiff fails to cite authority, nor is the Court aware of any, supporting

his position that he suffered an adverse employment action by having to hire an

attorney, pay for medical expenses, and use leave time during the grievance process.

To the contrary, these eventualities do not "amount to a significant change in [Plaintiff's]

employment status."  *See Meiners*, 359 F.3d at 1230; *Karamanos v. Baker*, No. 88-

4241, 1989 WL 88346, at *2 (9th Cir. July 28, 1989) (unpublished) (having failed to

establish that proposed letter of termination was adverse employment action, plaintiff

"cannot point to the adverse consequence of having to hire an attorney to establish

---

[6] *Roberts*, 149 F.3d at 1104, is further distinguishable because the plaintiff there
received "twenty warning letters, two suspensions, and one termination," all within two years
of his discrimination complaint.

adverse employment action"); *Candelaria v. Potter*, 132 Fed. Appx. 225, 226 (10th Cir.

2005) (unpublished) (medical reaction caused by employer reprimand was not adverse

employment action); *Ferencich v. Merritt*, 79 Fed. Appx. 408, 413 (10th Cir. 2003)

(unpublished) (use of some leave time was not adverse employment action).

Accordingly, even if Plaintiff could establish that he engaged in protected

opposition to discrimination, he cannot establish that he suffered an adverse

employment action.  Thus, viewing the record in the light most favorable to Plaintiff,

the Court finds that he is unable to meet his initial burden under *McDonnell Douglas*

of establishing a *prima facie* case of retaliation.[7]

## IV. **CONCLUSION**

Based on the foregoing, the Court ORDERS that Defendant's Motion for

Summary Judgment (Doc. # 32) is GRANTED.  Accordingly, this case is DISMISSED

WITH PREJUDICE.  It is

FURTHER ORDERED that the Final Trial Preparation Conference, scheduled for

November 14, 2011, and the five-day jury trial, scheduled for November 28, 2011, are

VACATED.  It is

---

[7] Therefore, the Court need not address the remaining steps of the *McDonnell Douglas* analysis.  *See, e.g.*, *Hinds v. Spring/United Mgmt. Co.*, 523 F.3d 1187, 1201-02 (10th Cir. 2008) ("[O]ur analysis begins and ends at the first *McDonnell Douglas* step because [plaintiff] fails to establish a prima facie case of retaliation.").  However, the Court would be prepared to determine in the alternative that Defendant had a legitimate non-discriminatory and non-pretextual reason for the Corrective Action based on Plaintiff's behavior, including most specifically making the "chicken shit" comment and pointing his finger at Moroney while telling him he was "lying through his teeth."  *See, e.g.*, *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (noting that federal courts do not sit as "super personnel department[s]" to "second guess[] employers' business judgments" (internal quotation marks and citations omitted)).

FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.  However, each party shall bear its own attorney fees.

DATED:  October __21__, 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge